**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David N. Chick, *et al.*, | No. CV-25-08150-PCT-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Jack Rose, *et al.*, | |
| Defendants. | |

At issue are two Motions to Dismiss (Doc. 25, "MTD 1"; Doc. 28, "MTD 2") filed by two groups of Defendants.[1] Plaintiffs filed a consolidated Response (Doc. 34, Resp.), and Defendants filed Replies (Doc. 35, "Reply 1"; Doc. 36, "Reply 2"). The Court will resolve the Motions without oral argument. LRCiv 7.2(f).

I.    **BACKGROUND**

In the Complaint (Doc. 1, Compl.), Plaintiffs allege the following facts. Plaintiffs loaned money by way of unsecured promissory Notes to entities controlled by Defendants Jack Rose, Quynh Palomino, and Jason Joseph, in furtherance of the purchase and development of two parcels of commercial land in the Prescott Valley in Arizona ("Prescott Valley I Project" and "Prescott Valley II Project"). Plaintiffs David Chick and Joseph Dalli were acting as Trustees of Plaintiff Mario and Emma Brondello Trust FBO Dawn

---

[1] One group of Defendants consists of Jack Rose; Quynh Palomino; Prescott Valley Holdings (GA) GP, LLC; Prescott Valley Holdings (GA), LLC; Prescott Valley Holdings II (GA) GP, LLC; Prescott Valley Holdings II (GA) GP, LLC; Iron Rings Holdings, LLC; and Trilogy Residences, LLC. (MTD 1.) The other group of Defendants consists of Jason Joseph and Trilogy Investment Company, LLC. (MTD 2.)

Brondello ("Brondello Trust") when it loaned $300k to Defendant PV Holdings (GA) GP, LLC ("PV1") on PV1's execution of a commercial promissory Note signed by Defendant Jason Joseph ("PV1 Brondello Trust Note"). Chick was acting as owner and beneficiary of nonparty Forge Trust Co. when it loaned $80k to PV1 on PV1's execution of a commercial promissory Note signed by Joseph ("PV1 Forge Note"). And Chick is assignee of the interests of nonparty DNC Insurance Services, Inc., which loaned $120k to PV1 on PV1's execution of a commercial promissory Note signed by Joseph ("PV1 DNC Note"). Dalli made two loans to PV1, for $139,040 and $150,000, on PV1's execution of two commercial promissory Notes signed by Joseph ("PV1 Dalli Notes 1 & 2"). All these Notes were executed in December 2021, and the terms of the Notes included repayment in 6 months at 20% interest per annum. All the loan agreements were modified in May 2022 and again in December 2022, at which times the maturity dates were extended and the accrued interest that was due was added to form a new principal balance. By way of example, by the end of 2023, Dalli's individual loan of $150,000 became a loan with a principal of $180,000 and an additional interest due of $38,200.

With regard to the second project, in May 2022, the Brondello Trust—of which Chick and Dalli are Trustees—loaned $500k to Defendant Prescott Valley Holdings II (GA) GP, LLC ("PV2") on PV2's execution of an unsecured commercial promissory Note providing for repayment in one year at 20% interest per annum ("PV2 Brondello Note 1"). In January 2024, the Brondello Trust increased the loan amount by $131,052 upon the execution of another promissory Note ("PV2 Brondello Note 2"), but the Brondello Trust then declined an additional funding request in May 2024. Ultimately, "problems arose" with the two projects, and Defendants have not repaid Plaintiffs on their loans under the terms of the Notes. (*E.g.*, Compl. ¶¶ 37–39, 61.)

In the Complaint, Plaintiffs name three individual Defendants—Rose, Palomino, and Joseph—and seven entity Defendants that are all allegedly controlled by these individual Defendants. Defendant Trilogy Investment Company, LLC ("TIC"), which among other things managed PV1 and executed the promissory Notes to the Brondello

Trust for the Prescott Valley II Project, was controlled by Joseph.[2] Defendant Iron Rings Holdings, LLC, is owned by Palomino and controlled by Palomino and Rose, and among other things the prospectuses for the two projects stated Iron Rings was a substantial investor in the two projects. Defendant Trilogy Residences, LLC ("TR"), which succeeded TIC as manager of PV1, is a joint venture between TIC and Iron Rings and controlled by Rose and Joseph. PV1, which has as its members Iron Rings as well as TR upon its succession of TIC, is controlled by Rose, Palomino, and Joseph, as is PV2. Finally, according to the allegations, Defendant PV Holdings (GA), LLC ("PV1 owner") is simply the owner of PV1 (its only member), and Defendant PV Holdings II (GA), LLC ("PV2 owner") likewise became the sole owner of PV2 (as eventually its only member). In short, the entity Defendants whose conduct Plaintiffs base their claims on are all allegedly controlled by Rose, Palomino, and Joseph.

Plaintiffs allege that their investments in the two projects were premised on misinformation and deception on the part of Defendants. In both projects, Plaintiffs allege that the individual Defendants orchestrated a purchase of the two parcels of land and then, on the same day, a self-dealing resale to different entities they controlled at a higher price to give the appearance that the land had a higher market value than it actually did. With regard to Prescott Valley I Project, nonparty Simpatico 6 Market Great Western, LLC ("Simpatico 6"), controlled by Palomino and Rose, bought the property for about $7 million and, on the same day, sold it to PV1, also controlled by Palomino and Rose as well as Joseph, for $10 million. And with regard to Prescott Valley II Project, Iron Rings, controlled by Palomino and Rose, exercised an option to purchase the land for $3.3 million and then immediately sold it to PV2, controlled by Rose and Joseph, for $5 million.

Plaintiffs also claim the prospectuses TIC provided to them contained deceptive and false representations, including the nature and ownership of the projects' joint venture and the true financial structure of the projects, for example by the concealment of the facts that Iron Rings was actually "putting little to no cash into the purchase" of the Prescott Valley

---

[2] The Complaint does not state the membership/ownership of TIC.

II Project parcel and "the land purchase was 100% debt financed." (Compl. ¶¶ 27, 53, 63–66.) When the Brondello Trust engaged in due diligence, "TIC, PV2, Rose, Palomino, and Joseph continued to misrepresent and actively conceal" material information. (Compl. ¶ 56.)

Plaintiffs now bring sixteen claims against Defendants comprised of eight causes of action for each of the two projects, namely: (Counts 1 & 2) breach of contract; (Counts 3 & 4) fraudulent concealment; (Counts 5 & 6) fraud; (Counts 7 & 8) intentional misrepresentation; (Counts 9 & 10) violation of § 12(a)(2) of the Securities Act of 1933; (Counts 11 & 12) violation of § 15 of the Securities Act of 1933; (Counts 13 & 14) violation of the Arizona Securities Fraud Act, A.R.S. § 44-1991; and (Counts 15 & 16) civil conspiracy. Defendants now move to dismiss almost all of Plaintiffs' claims.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up and citations omitted). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 679–80. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## III. ANALYSIS

### A. Breach of Contract Claims

In Counts 1 and 2, Plaintiffs raise claims of breach of contract against PV1 (in Count 1), PV2 (in Count 2), and the individual Defendants—Rose, Palomino, and Joseph—for failure to repay Plaintiffs' loans under the terms of the unsecured promissory Notes. (Compl. ¶¶ 72–85.) Defendants do not specifically seek dismissal of these claims against PV1 and PV2, and indeed Plaintiffs adequately allege facts supporting the required elements, which are universally held to be a showing of contract formation, a breach, and damages. *See, e.g.*, *Thunderbird Metallurgical, Inc. v. Ariz. Testing Lab.*, 423 P.2d 124, 126 (Ariz. 1967). But Defendants seek dismissal of these claims to the extent Plaintiffs raise them against the individual Defendants as alter egos of PV1 and PV2.

#### 1. Choice of Law

As a threshold matter, the Court must determine the law applicable to Plaintiffs' breach of contract claims and, relevant here, associated alter ego theory. According to Plaintiffs' allegations, the five unsecured promissory Notes at issue in Count 1 were entered into by PV1, an Arizona LLC that, at the time these five Notes were executed, had as its members a Georgia LLC and an Arizona LLC.[3] Iron Rings—the member Arizona LLC—was owned by Palomino, who according to the Complaint was either an Arizona or

---

[3] The Complaint states that the PV1 Notes were executed in December 2021 and the PV2 Brondello Note 1 was executed in May 2022, and Iron Rings—member of both PV1 and PV2—was an Arizona LLC until November 2022, when it became a Delaware LLC. PV2 Brondello Note 2 was executed in January 2024, after Iron Rings became a Delaware LLC.

Georgia citizen at the time. The ownership of TIC—the member Georgia LLC—is not identified in the Complaint. In short, Arizona and Georgia LLCs were involved in the execution of the Notes. For their part, Plaintiffs are California individuals and trusts. The Complaint neglects to mention whether the five Notes executed by Plaintiffs and PV1 had a choice of law provision, and the Notes are not attached to the Complaint.

Plaintiffs allege that the two unsecured promissory Notes at issue in Count 2 were entered into by PV2, a Georgia LLC that had as its members a Georgia LLC and an Arizona LLC that became a Delaware LLC between the execution of the two Notes. Those LLCs again had Palomino as an individual member, and LLC membership is otherwise not alleged. While Arizona, Georgia, and Delaware LLCs were involved in the execution of these two Notes with the California Plaintiffs, the Complaint again does not include the Notes or say whether they had a choice of law provision.

Because only entities promised to repay under the Notes—by way of Joseph signing on behalf of PV1 and TIC executing the PV2 Notes—Plaintiffs base their claims against the individuals—Palomino, Rose, and Joseph—on a theory of alter ego. Specifically, Plaintiffs seek to hold the individual Defendants liable for breach of the seven promissory Notes at issue through a particular alter ego theory, namely, that Rose, Palomino, and Joseph were "controlling parties responsible for the actions and financial decisions" of PV1 and PV2. (Compl. ¶¶ 76, 83; *see also* Compl. ¶¶ 91, 98 (fraudulent concealment claims); ¶¶ 104, 110 (fraud claims); ¶¶ 118, 126 (intentional misrepresentation claims); ¶¶ 142, 145 (Arizona Securities Fraud Act claims).) In their briefs, the parties cite only Arizona law in discussing Plaintiffs' alter ego theory without demonstrating why that is the law the Court should apply. (MTD 1 at 13–14; MTD 2 at 6–7; Resp. at 3–7; Reply 1 at 1–3; Reply 2 at 4–6.)

When the Court has jurisdiction over a claim based on the diversity of the parties, as it does over the state law claims here, it must apply Arizona's choice of law rules to decide which state's law should govern the issues raised in the claim. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Arizona has adopted the choice of

law rules of the Restatement (Second) of Conflict of Laws ("Restatement"). *Bryant v. Silverman*, 703 P.2d 1190, 1191 (Ariz. 1985). As a first principle, the Restatement provides that the Court must make a choice of law determination on an issue-by-issue or claim-by-claim basis—a determination that may lead to depecage. *E.g.*, Restatement § 187(1) (requiring analysis by "particular issue"); *Keene Corp. v. Ins. Co. of N. Am.*, 597 F. Supp. 934, 941 (D.D.C. 1984) (quoting Reese, *Depecage: A Common Phenomenon in Choice of Law*, 73 Columbia L. Rev. 58, 59–60 (1973) ("The search . . . is not for the state whose law will be applied to govern all issues in a case; rather, it is for the rule of law that can most approximately be applied to govern the particular issue")).

Dispensing with the full choice-of-law analysis for the purpose of resolving the present Motions, the Court observes that, under the Restatement, the question whether the corporate veil should be pierced, that is, whether the corporate form should be disregarded to reach individual members of the corporate entity, is generally a question of the corporate entity's internal affairs resolved under the local law of the state of incorporation unless the corporate entity has little or no contact with that state. Restatement §§ 302(g), 309; *see Taurus IP v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1336 (Fed. Cir. 2013) (applying the law of the state of incorporation to determine whether the corporate veil was properly pierced to reach the managing member). Here, when the Notes were executed, PV1 was an Arizona LLC comprised of Arizona and Georgia LLCs, and PV2 was a Georgia LLC comprised of Georgia, Arizona, and Delaware LLCs. No information before the Court goes to the nature and extent of the relationship of these LLCs with their states of incorporation, and the Court can draw no singular conclusion as to the law to be applied to Plaintiffs' alter ego theory. The Court will thus examine whether Plaintiffs' allegations are sufficient under the law of any of the three possible states: Arizona, Georgia, or Delaware. *See Gnatkiv v. Machkur*, 372 P.3d 1010, 1014 n.1 (Ariz. Ct. App. 2016) (noting the starting point in choosing the state law to be applied to a claim is determining whether a "true difference" exists in the laws of the states under consideration).

## 2.   Alter Ego Liability

To begin with, Plaintiffs' alter ego theory premised on the individual Defendants' total control of the LLCs is cognizable in certain states. *See, e.g.*, *Taurus IP*, 726 F.3d at 1336 (Wisconsin law permits piercing the corporate veil where the member manager has "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own," and where "[s]uch control must have been used by the defendant to commit fraud or wrong" and "[t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of"). However, the Court's research did not uncover case law stating that a theory of alter ego liability based strictly on control is viable to pierce the corporate veil in any of the three possible, applicable states.[4]

The alter ego law of each of the three states in play here is a variation of identical principles. Under Arizona law, as cited by the parties, "[a] corporate entity will be disregarded, and the corporate veil pierced, only if there is sufficient evidence that 1) the corporation is the 'alter ego or business conduit of a person,' and 2) disregarding the corporation's separate legal status is 'necessary to prevent injustice or fraud.'" *Loiselle v. Cosas Mgmt. Grp., LLC*, 228 P.3d 943, 950 (Ariz. Ct. App. 2010) (quoting *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. Ct. App. 1972) and *State v. Angelo*, 800 P.2d 11, 14 (Ariz. Ct. App. 1990)). With regard to the first element, "alter-ego status . . . exists when there is such a unity of interest and ownership that the separate personalities of the corporation and owners cease to exist." *Dietel*, 492 P.2d at 457. Relevant factors to consider in determining the existence of an alter ego relationship include "payment of salaries and expenses" by the owner, an "owners' making of interest-free loans to the corporation," "commingling of personal and corporate funds," "diversion of corporate property" for personal use, the lack of "observance of formalities at corporate meetings," and, where one entity is alleged to be

_____

[4] The first Motion to Dismiss contains the sole reference to a choice of law analysis in any of the briefing, where those Defendants state in a footnote, without legal citation, that "there is no 'controlling parties' exception to limited liability separateness in Arizona, Georgia, or Delaware." (MTD 1 at 13 n.4.)

another entity's alter ego, the presence of common officers or directors. *Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195–96 (Ariz. Ct. App. 1994); *see also Ariz. Pub. Serv. Co. v. Ariz. Corp. Comm'n*, 746 P.2d 4, 8 (Ariz. Ct. App. 1987). The actions of the corporation and its owners must be "so closely intermix[ed] . . . such as to justify finding a merger of identities." *Honeywell, Inc. v. Arnold Constr. Co.*, 654 P.2d 301, 307 (Ariz. Ct. App. 1982).

The Arizona test for alter-ego liability is conjunctive. Therefore, to proceed on a claim against an individual premised on alter ego liability, a plaintiff must also show that continued observance of the corporate form would work an injustice or fraud. *See Loiselle*, 228 P.3d at 950. One of the means by which a plaintiff may establish the injustice prong is by demonstrating that an entity was formed with "obviously inadequate capital." *Norris Chem. Co. v. Ingram*, 679 P.2d 567, 570–71 (Ariz. Ct. App. 1984). It is of no consequence that an entity that was adequately capitalized at the time of formation eventually becomes insolvent and unable to pay its debts. *Id.* Rather, a plaintiff must establish that the entity's capitalization was inadequate *ab initio*. *Id.* Other means by which a plaintiff may satisfy the injustice prong of Arizona's alter-ego test include "presenting evidence that the corporation was 'formed for the purpose of perpetrating a fraud or other illegal act,'" *Barbano v. Brown*, 2023 WL 6896980, at *2 (Ariz. Ct. App. Oct. 19, 2023) (quoting *Butler v. Am. Asphalt & Contracting Co.*, 25 Ariz. App. 26, 30 (1975)), or showing that "'observance of the corporate form would confuse the opposing parties and frustrate their efforts to protect their rights,'" *id.* (quoting *Keg Rests. Ariz., Inc. v. Jones*, 375 P.3d 1173, 1184 (Ariz. Ct. App. 2016)).

Similarly, in Georgia,

[i]n order to disregard the corporate entity because a corporation is a mere alter ego or business conduit of a person, it should have been used as a subterfuge so that to observe it would work an injustice. To prevail based upon this theory it is necessary to show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such *unity of interest and ownership* that the separate personalities of the corporation and the owners no longer exist. The concept

of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility.

*Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 299 (Ga. 2005) (emphasis added) (internal citations omitted).

And in Delaware,

. . . courts consider a number of factors in determining whether to disregard the corporate form and pierce the corporate veil, including: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder. While these factors are useful, any single one of them is not determinative. An ultimate decision regarding veil-piercing is largely based on some combination of these factors, in addition to an overall element of injustice or unfairness.

*Manichaean Cap., LLC v. Exala Techs., Inc.*, 251 A.3d 694, 706–07 (Del. Ch. 2021) (internal quotations and citations omitted).

Plaintiffs' allegations are insufficient to plausibly demonstrate a unity of interest and ownership between the individual Defendants and PV1 or PV2 or any of their entity members. Alter ego liability under the subject states' laws applies only to *owners* of the corporation (or in this case, members of the LLC), and only if those owners commingle and unify their interests with the corporation to such an extent that they are essentially one and the same. *See Dietel*, 492 P.2d at 457; *U.S. Bank Nat'l Ass'n v. Starr Pass Resort Devs. LLC*, 2019 WL 2237471, at *15 (Ariz. Ct. App. May 22, 2019) ("Imposing alter-ego liability . . . holds one entity liable for the debts of another entity, or an owner liable for corporate debts."). In applying California law—which, like the state laws potentially applicable here, requires "such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased"—the Ninth Circuit explicitly held that "ownership is a prerequisite to alter ego liability." *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).

- 10 -

Here, there are no allegations in the Complaint that either Rose or Joseph has an ownership interest in any of the LLCs implicated in the alleged breaches of the Notes or fraud scheme. While Plaintiffs allege Rose and Joseph are "decisionmakers" and "managers" of the LLCs (Compl. ¶¶ 8–13), that is insufficient under the three states' laws to find that they are alter egos of the LLCs. Plaintiffs cannot show a unity of ownership for individual Defendants who, according to the allegations, have no ownership interest in the LLCs. *See id.* (applying parallel California law).

As for Palomino, while Plaintiffs allege she is the "member owner" of Iron Rings (Compl. ¶ 11), which in turn is a member of both PV1 and PV2, the Complaint contains no non-conclusory factual allegations that she, for example, commingled her personal funds with those of the LLCs or diverted the LLCs' property for her personal use, let alone that she failed to maintain corporate records or observe other formalities of the LLCs' separate existences.[5] *See, e.g.*, *Deutsche Credit Corp.*, 876 P.2d at 1195–96. Thus, although Plaintiffs allege Palomino has an ownership interest in Iron Rings, they again fail to allege sufficient facts to show a unity of interest and ownership as required to pierce the corporate veil and find Palomino liable for PV1's and PV2's alleged breaches and fraudulent acts. Because Plaintiffs' alter ego theory fails on the element of a unity of interest and ownership, the Court need not reach the injustice prong of Plaintiffs' alter ego theory. The Court will dismiss Plaintiffs' claims against the individual Defendants to the extent the claims rely on Plaintiffs' alter ego theory.

Where the Court dismisses a claim but the defects in the claim can be cured, a plaintiff is entitled to amend the complaint before it is dismissed. *See Lopez v. Smith*, 203 F.3d 1122, 1127–30 (9th Cir. 2000). Because it is possible that Plaintiffs could allege facts

---

[5] Although some of Plaintiff's allegations have the hallmarks of boilerplate pleading (*e.g.*, Compl. ¶ 76) and some courts in this district and circuit have permitted alter ego theories to survive on pre-discovery allegations that are primarily conclusory in character, *see, e.g.*, *Barba v. Seung Heun Lee*, No. CV 09-1115-PHX-SRB, 2009 WL 8747368, at *5 (D. Ariz. Nov. 4, 2009); *Whitney v. Wurtz*, 2006 WL 83119, at *2 (N.D. Cal. Jan. 11, 2006), the Court declines to do so here in the absence of any non-conclusory factual allegations going to the required unity of ownership and interest.

to adequately plead alter ego liability in Counts 1 through 8 and 13 through 14, the Court will grant Plaintiffs leave to amend if they can cure the pleading defects.

### 3.    Punitive Damages

Defendants next argue that Plaintiffs cannot seek punitive damages for their breach of contract claims. Presuming (as the parties do) for the purpose of resolving Defendants' Motions to Dismiss that Arizona law applies to Plaintiffs' claims for breach of the Notes, "punitive damages are not allowed in a breach of contract suit." *John Hancock Mut. Life Ins. Co. v. McNeill*, 556 P.2d 803, 809 (Ariz. Ct. App. 1976) (citing *Cont'l Nat'l Bank v. Evans*, 489 P.2d 15, 19 (Ariz. 1971)). Plaintiffs argue that punitive damages are available "where a breach of contract constitutes a tort" (Resp. at 23), but such a tort claim—for example, a bad faith claim—is distinct from a breach of contract claim, and Plaintiff does not raise such a claim here. Accordingly, the Court will dismiss Plaintiffs' prayer for punitive damages as applied to their breach of contract claims.

### B.    Fraud-Based Claims under State Law

Plaintiffs raise six fraud-based claims under state common law, including fraudulent concealment and fraud against PV1 Owner, PV2 Owner, TIC, TR, and Iron Rings; and intentional misrepresentation against all those entity Defendants except Iron Rings.[6] (Counts 3–8.) Once again, the parties apply Arizona law to these claims without substantiation, and the Court cannot make a choice of law determination with the information before it. For example, PV2 Brondello Note 2 was executed by California residents, as lenders, and the borrower, PV2—a Georgia LLC comprised of TR, another Georgia LLC, and Iron Rings, by this time a Delaware LLC, all comprised of a Georgia individual or individuals. Although the project underlying PV2 Brondello Note 2 was located in Arizona, the Note was unsecured. None of the parties were located in Arizona,

---

[6] As stated above, the Court will dismiss these claims as brought against the individual Defendants—Palomino, Rose, and Joseph—for failure to adequately plead alter ego. Moreover, while the Complaint lists each of these claims "as to PV1" or "as to PV2," Plaintiffs do not include those entities in the allegations supporting these claims, and the Court must therefore conclude Plaintiffs are not bringing these six claims against PV1 or PV2.

and, presumably, the fraud Defendants allegedly committed did not occur in Arizona. Again, Plaintiffs neglect to mention whether the Notes had a choice of law provision.

For the sake of resolving the present Motions, the Court will look to Arizona law without deciding it applies here. To that end, a party may be liable for fraudulent concealment (Counts 3 and 4) "for acts taken to conceal, mislead, or otherwise deceive, even in the absence of a fiduciary, statutory, or other legal duty to disclose." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395*, 38 P.3d 12, 21 (Ariz. 2002). The Restatement (Second) of Torts § 550 provides, "One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." *Id.* at 34; *see also Frazier v. Sw. Sav. & Loan Ass'n*, 653 P.2d 362, 367 (Ariz. Ct. App. 1982). Here, none of the entity Defendants against whom Plaintiffs bring their fraudulent concealment claim are parties to the transaction at issue—the Notes—so the fraudulent concealment claims fail on their face. If Plaintiffs mean to imply that the named entity Defendants—PV1 Owner, PV2 Owner, TIC, TR, and Iron Rings—were alter egos of PV1 and PV2, which were parties to the transactions, the factual allegations do not plausibly demonstrate that. The only non-conclusory allegation in that regard is that the individual Defendants were managers or decisionmakers of the entity Defendants. But that is not enough to demonstrate that the Court should disregard the corporate form with regard to PV1 or PV2 to reach the other entity Defendants. Counts 3 and 4 fail for this reason alone.

Next, in Arizona, claims of fraud (Counts 5 and 6) and intentional misrepresentation (Counts 7 and 8) are the same cause of action, [7] and indeed the Court cannot discern a

---

[7] The Court in *Wells Fargo Bank* explained:

[T]here are three distinct classes of fraud: misrepresentation, concealment, and non-disclosure. Liability for fraudulent misrepresentation occurs under § 525 of the Restatement (Second) of Torts and lies against '[o]ne who fraudulently makes a misrepresentation of fact ... for the purpose of inducing another to act or to refrain from action....' In contrast, liability for

difference in the claims as pled in the Complaint (Compl. ¶¶ 100–27) other than the fact that Plaintiffs name Iron Rings as Defendant in Counts 5 and 6 and do not name Iron Rings as Defendant in Counts 7 and 8. The requirements for proof of common law fraud in Arizona are "very strict" and require a showing of nine elements: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) intent that it should be acted upon, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury. *Fridenmaker v. Valley Nat'l Bank of Ariz.*, 534 P.2d 1064, 1067–68 (Ariz. Ct. App. 1975). The "failure to prove any one of the essential elements is fatal to the cause of action." *Id.* at 1068.

Where a plaintiff alleges fraud or misrepresentation, Federal Rule of Civil Procedure 9(b) imposes heightened pleading requirements. Specifically, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). The heightened pleading requirements apply even where "fraud is not a necessary element of a claim." *Vess*, 317 F.3d at 1106. So long as a plaintiff alleges a claim that "sounds in fraud" or is "grounded in fraud," Rule 9(b) applies. *Id.* "While a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the *circumstances* of the fraud must be stated with particularity is a federally imposed rule." *Id.*

. . .

_____

> nondisclosure occurs under § 551 of the Restatement (Second) of Torts and lies against '[o]ne who fails to disclose to another a fact ... if, but only if, he is under a duty to the other ... to disclose the matter in question.' Liability for fraudulent concealment occurs under § 550 of the Restatement (Second) of Torts and lies against a 'party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information.'

> 38 P.3d at 34 n.22.

Here, with the exception of TIC's alleged conduct in providing the prospectuses to Plaintiffs, the allegations of fraud in the Complaint are conclusory and lack the particularity required under the heightened standard of Rule 9(b). Indeed, aside from repeated conclusory allegations, the Complaint does not detail how (or when or where) each of the other named entity Defendants is implicated in the alleged fraudulent statements. In other words, while the Complaint alleges with specificity that TIC sent prospectuses to Plaintiffs that contained false statements and omissions to try to influence Plaintiffs to enter into the Notes (Compl. ¶¶ 25, 40, 44),[8] it is unclear what statements PV1 Owner, PV2 Owner, TR, or Iron Rings made or why any of the entity Defendants should be liable for the statements of nonparty Luke White, who Plaintiffs allege represented nonparty Virtua Partners. Because of this lack of particularity and precision, Plaintiffs fail to adequately allege claims grounded in fraud under Rule 9(b) against any Defendant but TIC.

With regard to the statements made in the prospectuses TIC allegedly provided to and discussed with Plaintiffs, Defendants contend Plaintiffs do not adequately allege the statements were false or that any omissions were material.[9] (MTD 1 at 3–7; MTD 2 at 9–10.) As for false statements and omissions with regard to the PV1 Notes, Plaintiffs allege "the prospectus stated that the offering was a joint venture of 33 Degrees Partners, LLC, Iron Rings, and TIC, indicating they were ownership-sharing entities" (Compl. ¶ 27) and "[t]he interrelationship of the selling and buying parties, the mark up in the sales price of

---

[8] In their Motion to Dismiss, TIC and Joseph contend Plaintiffs "fail to allege any facts supporting the conclusion that *TIC* was the sender" of the prospectuses containing false and misleading information and omissions. (MTD 2 at 9.) That is false. In the very paragraphs of the Complaint TIC and Joseph cite in their brief, Plaintiffs allege: "TIC sent a prospectus dated November 30, 2021, and other information to [Plaintiffs], seeking investment in the Prescott Valley I Project" (Compl. ¶ 25); "On May 4, 2022, TIC sent representatives of the Brondello Trust a prospectus regarding a preferred note opportunity it was sponsoring in connection with a second project in Prescott Valley" (Compl. ¶ 40); and "TIC emailed a prospectus to and called the Trust's representatives in California as part of its effort to obtain an investment in the Prescott Valley II Project" (Compl. ¶ 44). To the extent TIC and Joseph contend that Plaintiffs' non-conclusory factual allegations are not true, the Court must take them as true in resolving the present Rule 12(b)(6) motions to dismiss.

[9] Defendants also argue the Complaint is deficient in pleading a duty to disclose. (MTD 1 at 5–7.) A duty to disclose is not an element of a fraud claim under Arizona law. *E.g.*, *Wells Fargo Bank*, 38 P.3d at 34 n.22.

- 15 -

the property sold to PV1 Owner, the seller carryback transaction, and the true value of the adjacent properties were all held back and never disclosed to [Plaintiffs]" in the prospectuses or other communications (Compl. ¶ 31). With regard to the PV2 Notes, Plaintiffs allege "that Iron Rings had a co-investment/common equity of over 28% of the total budgeted for the Prescott Valley II land purchase, indicating a co-seller role" (Resp. at 18 (citing Compl. ¶ 45)); and that "Iron Rings was making a cash 'co-investment' of $1,580,000" (Resp. at 19 (citing Compl. ¶ 52)). Plaintiffs further allege that, in fact, "Iron Rings was putting little to no cash into the purchase, and that the land purchase was 100% debt financed." (Resp. at 19 (citing Compl. ¶ 53).) Plaintiffs allege that, had they known the material facts surrounding the transaction, they would not have invested in the Prescott Valley projects. (*E.g.*, Compl. ¶ 54 (stating had the Brondello Trust known "that the land was purchased from a related/same party; that the purchase was a self-dealing transaction; that the purchase prices had been market up 50% above the current market prices; that the sponsor had minimal or no cash in the purchase; and that the purchase was intended to be 100% debt-financed," then "the Trust never would have invested in the Prescott Valley II Project"); ¶ 67 (stating "[h]ad Chick been aware of the self-dealing, that the same parties [were] involved in the option purchase and simultaneous PV2 purchase, the attendant financial structuring, the $0 cash 'co-investment' by Iron Rings, and the 100% debt-financed nature of the transaction, he would not have invested in the Prescott Valley II Project or the Prescott Valley I Project").)

At this stage of the litigation, Plaintiffs have adequately alleged false statements and omissions that were material to their purchases of the Notes. Because the only fraudulent communications pled with the requisite particularity in the Complaint are TIC's provision of the prospectuses containing the allegedly false and misleading information, Plaintiffs have stated fraud claims against TIC. But because Plaintiffs may be able to cure the defects in Counts 3 through 8 as to other Defendants by amending the Complaint, the Court will grant them leave to amend these claims. *See Lopez*, 203 F.3d at 1127–30.

. . .

### C.    Securities Fraud Claims

Plaintiffs next bring claims under §§ 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77l, §77o. (Counts 9–12.) To adequately plead a claim under § 12(a)(2), a plaintiff must allege facts from which the Court can plausibly infer that, with regard to the sale of a security, "(1) the defendant qualifies as a statutory seller or offeror; (2) the sale was effected by means of a prospectus or oral communication; and (3) the communication contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1257 (9th Cir. 2022) (cleaned up); *see* 15 U.S.C. § 77l(a)(2).

Section 15 of the Securities Act imposes secondary liability on a person who "controls any person liable" for a violation of §§ 11 or 12 of the Act. 15 U.S.C. § 77o. A "control person" under § 15 is a person who possesses "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Plaintiffs also bring claims under the Arizona Securities Fraud Act, A.R.S. § 44-1991.[10] (Counts 13–14.) Section 44-1991(A)(1) prohibits a person from employing "any device, scheme, or artifice to defraud" in connection with a securities transaction, and § 44-1991(A)(2) prohibits making "any untrue statement of material fact" or omitting "any material fact necessary" to make a statement "not misleading." The plaintiff must show the defendant "made, participated in, or induced the security transaction at issue." *Allstate Life Ins. Co. v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1157 (D. Ariz. 2010) (citing A.R.S. § 44-2001(A)).

Defendants now seek to dismiss these six claims, arguing that (1) Plaintiffs again fail to meet the Rule 9(b) pleading standard for claims grounded in fraud, (2) the Notes are not securities under the Acts, (3) Defendants are not "sellers" of securities under the Acts, (4) Plaintiffs failed to tender the Notes as required to bring their Securities Act claims, (5)

---

[10] For the purpose of resolving the present Motions, the Court again presumes without deciding that the Arizona Securities Fraud Act may apply to the parties' execution of the Notes here.

Plaintiffs failed to adequately plead loss causation, and (6) Plaintiffs' "control person" claims fail in the absence of primary violations of the Acts. (MTD 1 at 3–13; MTD 2 at 7–14.) The Court will now examine these arguments in turn.

### 1.    Pleading Defects

To begin with, the requirement to plead fraud with particularity under Rule 9(b), as discussed *supra*, applies to claims brought under the Securities Act when, as here, the claims are grounded in averments of fraud. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) ("Although the heightened pleading requirements of the [Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)] do not apply to section 11 claims, plaintiffs are required to allege their claims with increased particularity under [Rule] 9b if their complaint 'sounds in fraud.'" (internal citations omitted).) Likewise, the alleged untrue statements or material omissions under the Arizona Securities Fraud Act must be stated with particularity under Rule 9(b). *Cf.* A.R.S. § 44-2082(A) (Arizona also requires that fraud allegations be pled with particularity for claims under the Arizona Securities Fraud Act). For the reasons stated *supra* with regard to Plaintiffs' common law fraud claims, Plaintiffs' fraud allegations under the Securities Act and Arizona Securities Fraud Act are likewise deficient, with the exception of Plaintiffs' allegations that TIC provided them with a false or misleading prospectus.

Moreover, under the Arizona Securities Fraud Act, a plaintiff may only recover money damages on proof that "the defendant acted with a particular state of mind," and a complaint must therefore "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." A.R.S. § 44-2082(B); *see, e.g.*, *Kretsch v. Barton*, 2024 WL 962181, at *5–6 (D. Ariz. Mar. 6, 2024). ("[A] plaintiff bringing an action under § 44-1991(A)(1) must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'—knowingly or recklessly—in each alleged act or omission and 'specify each alleged untrue statement or material omission and the reason or reasons why the statement or omission is misleading or the omission is material.'" (quoting A.R.S. § 44-2082)). Here, the allegations in the

Complaint do not raise the plausible inference that Defendants intended anything but to induce Plaintiffs to enter into the Notes, which is simply a general business motive and does not support a securities fraud claim under Arizona law. For example, Plaintiffs allege that certain Defendants participated in the repurchase of the two parcels of land at a higher price to allegedly make them appear more valuable, but from that fact and without more, it is only plausible Defendants intended to induce Plaintiffs' investment, not that Defendants intended to defraud Plaintiffs of their investment. Therefore, in addition to the pleading defects under Rule 9(b), as detailed above, Plaintiffs fail to plead the requisite scienter to support their Arizona Securities Fraud Act claims.

## 2.    The Notes as Securities

Those pleading defects aside, the Court must determine whether Plaintiffs' allegations are sufficient to raise the plausible inference that the Notes constitute securities as contemplated by the Securities Act and Arizona Securities Fraud Act. Generally, notes are considered "securities" governed by the Securities Act if they are "issued in an investment context," but not if they are "issued in a commercial or consumer context." *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990). The Supreme Court has clarified that, to determine "whether an instrument denominated a 'note' is a 'security,' courts are to apply the version of the 'family resemblance' test that [the Court articulates here]: A note is presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note bears a strong resemblance . . . to one of the enumerated categories of instrument," or by a showing that an examination of relevant factors justifies expanding the enumerated list of categories of instrument to include another instrument as a non-security. *Id.* at 66–67 (referring to the list of non-securities set forth in *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)).

Defendants do not contend that the Notes sold to Plaintiffs are akin to any of the enumerated non-securities under the "family resemblance" test but argue instead that an examination of certain relevant factors weighs against finding the Notes are securities.

(MTD 1 at 10–12.) In the absence of substantial similarity to one of the enumerated non-securities, the Supreme Court has set forth factors a court should consider in determining if a note is a "security" under the Act. *Id.* at 66. The first factor is an assessment of "the motivations that would prompt a reasonable seller and buyer" to enter into the transaction; "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Id.* "If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'" *Id.*

The second factor is an examination of the "'plan of distribution' of the instrument to determine whether it is an instrument in which there is 'common trading for speculation or investment.'" *Id.* (citations omitted). Third, a court is to examine "the reasonable expectations of the investing public," where for example "common stock is always a security" but the sale of a business to a "single informed purchaser through stock is not within the purview" of the Securities Act. *Id.* at 66–67 (citations omitted). And the final factor is whether "the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 67.

Defendants rely on *Amfac Mortgage Corporation v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 434 (9th Cir. 1978), to argue that the Notes here are not securities under the Act. (MTD 1 at 11–12.) There, the Ninth Circuit examined the "economic realities" of the plaintiff's loan in the development of a shopping center by way of a promissory note from the defendant to determine whether the loan constituted "risk capital." *Id.* at 432–34. The court concluded that the district court had properly dismissed the plaintiff's Securities Act claim because the plaintiff's note was not a security under the Act, but rather an ordinary "note given to a lender in the course of a commercial financing transaction." *Id.* at 434.

The test the court applied, however, was explicitly rejected in *Reves*, 494 U.S. at 64, so the court's analysis in *Amfac* is of limited utility here.

Defendants do not contend under *Reves* that the Notes bear resemblance to one of the enumerated instruments considered not to be a security. They argue instead under the factors that the Plaintiffs have not alleged that the Notes were commonly traded or that there was a secondary market for them, and they conclusorily contend that Plaintiffs' loans were not the kind of investment the commercial world commonly considers to be a security. (MTD 1 at 11.)

But the enumerated instruments—those considered non-securities—include a "note secured by a mortgage on a home," a "short-term note secured by a lien on a small business or some of its assets," and "short-term notes secured by an assignment of accounts receivable." *Reves*, 494 U.S. at 65. Defendants imply that because Plaintiffs "did not allege they received any ownership interest in either project," the Notes are not securities, but the enumerated instruments demonstrate the opposite; it is the secured short-term notes that are generally not securities under the Act. *See id.*

Plaintiffs are correct that, upon engaging in Defendants' examination of Plaintiffs' allegations under the *Reves* factors, the first factor weighs in favor of a finding that the Notes are securities under the Act. (Resp. at 19–21.) Plaintiffs' allegations show TIC's purpose in borrowing money under the Notes on behalf of PV1 and PV2 (through TR) was "to raise money for the general use of a business enterprise or to finance substantial investments," and Plaintiffs were "interested primarily in the profit the [Notes were] expected to generate." *Id.* at 66. In the context of Plaintiffs' allegations in the Complaint, Defendants have demonstrated neither that the Notes are akin to any of the enumerated non-securities nor that the factors necessarily favor finding the Notes are not securities under the Act, so the Court will deny Defendants' request to dismiss Counts 9 through 14 as to TIC on this basis.[11]

---

[11] Generally, courts are to interpret the Arizona Securities Fraud Act consistently with "federal securities law unless there is a good reason to depart from that authority." *Sell v. Gama*, 295 P.3d 421, 425 (Ariz. 2013).

- 21 -

### 3.    Defendants as Sellers

Next, Defendants argue Plaintiffs' allegations are insufficient to show they are "sellers" under the Securities Act. Only a person who "offers or sells a security" may be liable under the Act, 15 U.S.C. § 77l(a)(2), and the Supreme Court has clarified that the Act does not impose "liability for mere participation in unlawful sales transactions," *Pinter v. Dahl*, 486 U.S. 622, 646 (1988). "The term 'offer to sell' or 'offer' means 'solicitation of an offer to buy . . . for value." *Pino*, 55 F.4th at 1257 (quoting 15 U.S.C. § 77b(b)(3)). Under *Pinter*, "a person may be liable as a 'seller' . . . if the person either (1) passes title to the securities to the plaintiff; or (2) 'engages in solicitation,' *i.e.*, 'solicits the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Id.* at 1257–58 (quoting *Pinter*, 486 U.S. at 643, 647–48).

In the Complaint, Plaintiffs allege that TIC provided them with prospectuses containing false or misleading information or omissions in conjunction with the sale of the Notes and that PV1 and PV2 executed the Notes for the respective Prescott Valley real estate development projects. As the Court found *supra*, Plaintiffs' allegations of false material statements by TIC are sufficiently particularized, but the allegations of false material statements by the other Defendants lack the required particularity and precision, and the Court cannot plausibly attribute them to any Defendant other than TIC.

With regard to TIC, Plaintiffs have alleged sufficient facts from which the Court can infer it was a "seller" under the Act where Plaintiffs allege that TIC provided the prospectuses, solicited Plaintiffs to purchase the Notes from PV1 and PV2, and served either its own financial interests or those of PV1, of which it was a member, or PV2, of which it was a member of a member. (Compl. ¶¶ 25, 40, 44, 148); *Pino*, 55 F.4th at 1257 ("Creating liability for those who solicit a sale for financial gain, as opposed to limiting it to those who simply pass title, is consistent with the Securities Act's remedial goal of protecting purchasers from the harm caused by promoters' material misstatements and

omissions, in part due to the promoter's superior access to information concerning the securities and their valuation.")

### 4.     Tendering the Notes under Section 12(a)(2)

Section 12(a)(2) of the Securities Act provides that, where a seller or offeror of a security made a material misrepresentation or omission in a prospectus, the purchaser may sue "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." TIC and Joseph argue that, under § 12(a)(2), because Plaintiffs have not sold the Notes, they may not sue for damages; because Plaintiffs have not tendered the Notes, they may not seek rescission and restitution. (MTD 2 at 11.) In support, these Defendants cite only a 1983 District of Massachusetts case. (MTD 2 at 11; Reply 2 at 8.)

The Court's research did not uncover any applicable legal authority on this subject, apart of course from the language of the statute itself. The Court agrees with Plaintiffs that "tender" in the context of the Notes here is constructively accomplished by the refusal of PV1 and PV2 to pay under the terms of the Note. (Resp. at 15–16.) As Plaintiffs state, "[t]he 'tender' element for a security ensures that there is an actual conflict before a case is filed by confirming that a defendant is not willing to buy back the security." (Resp. at 15.) Here, the allegations provide that Defendants are not willing to buy back the Notes, so Plaintiffs adequately allege the § 12(a)(2) requirement to tender—or such an allegation is not required in this instance—in order to sue for the consideration they paid for the Notes plus interest minus any payments on the Notes they received from PV1 or PV2. Plaintiffs do not allege that they no longer own the security—quite the contrary, as TIC and Joseph point out—so under the plain language of § 12(a)(2), they may not seek damages under the Act.

The Court thus reads Plaintiffs' claims under § 12(a)(2) of the Securities Act as pled in the alternative to their breach of contract claims, because, as TIC and Joseph argue, Plaintiffs cannot simultaneously recover for both, or "have their cake and eat it too," in this

instance. (Reply 2 at 8.) The distinction between these claims, as presently pled, is that the breach of contract claims survive only against PV1 and PV2, the § 12(a)(2) claims survive only against TIC, and as set forth *infra*, the § 15 claims survive only against Joseph.

### 5.    Loss Causation

Defendants also argue Plaintiffs do not adequately allege loss causation, citing a decision from the Second Circuit that addressed a claim under a different statute, §10(b) of the Securities Exchange Act of 1934. (MTD 1 at 7–8; Resp. at 14–15.) But the Ninth Circuit has stated that causation "is not a necessary element of a prima facie case under section 12 of the Securities Act." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005), *abrogated on other grounds as acknowledged in Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023), (citing *Casella v. Webb*, 883 F.2d 805, 808 & n.8 (9th Cir. 1989)); *see also Pino*, 55 F.4th at 1257. In any case, the Court can infer from Plaintiffs' allegations that their lost investments could have arisen from the combination of the alleged material misrepresentations and omissions, that is, that "problems arose" in the two real estate development projects as a result of the alleged financial structuring of the projects, the lack of equity invested by Defendants, and the fact that "the debt ratio exceeded the purchase price of the land on the date of the transactions." (*E.g.*, Compl. ¶¶ 67–70.)

### 6.    "Control Person" Claim under Section 15

In Counts 11 and 12, Plaintiffs raise claims against the three individual Defendants—Rose, Palomino, and Joseph—under § 15 of the Securities Act. In its examination of Plaintiffs' § 12(a)(2) claim, the Court found Plaintiffs have only adequately alleged a primary violation against TIC. With regard to § 15, Plaintiffs have also adequately alleged Joseph is a "control person" of TIC—a person who possesses "the power to direct or cause the direction of the management and policies of [TIC], whether through the ownership of voting securities, by contract, or otherwise," 17 C.F.R. § 230.405—by alleging Joseph is the manager of TIC, and indeed all the PV1 Notes Plaintiffs bought were

signed by Joseph on behalf of TIC as member manager of PV1. TIC also allegedly executed the PV2 Notes. Plaintiffs thus state a § 15 claim against Joseph but not Rose or Palomino.

### D. Civil Conspiracy Claims

Finally, Plaintiffs allege in Counts 15 and 16 that the individual Defendants together with TIC, TR, Iron Rings, and PV1 and PV1 Owner with respect to Prescott Valley I Project, or PV2 and PV2 Owner with respect to Prescott Valley II Project, "had an agreement to engage in self-dealing and intentionally misrepresent and fraudulently conceal material facts" about the real estate development projects "in order to obtain funds from [Plaintiffs] and enrich themselves." (Compl. ¶¶ 148, 153.) To the extent Arizona law applies to this claim, it provides that, "[f]or a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Wells Fargo Bank*, 38 P.3d at 36.

Because Plaintiffs' claim is a conspiracy to commit fraud, its viability depends on whether the averments of fraud are pled with particularity under Rule 9(b). As discussed *supra*, Plaintiffs do not allege fraudulent statements with the requisite particularity against any party except TIC. Moreover, the Complaint does not contain non-conclusory allegations as to an agreement or understanding to commit fraud between Defendants. *See S. Union Co. v. Sw. Gas Corp.*, 165 F. Supp. 2d 1010, 1020 (D. Ariz. 2001) ("Merely using the term 'complicity' and making general allegations that all Defendants were involved in the fraudulent inducement does not satisfy the particularity requirements of Rule 9(b)." (citing *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985))). The Court disagrees with Plaintiffs that it can infer an agreement or understanding to support a conspiracy claim just from the Complaint's recitation of the chain of events and Plaintiffs' conclusory allegations of cooperation between Defendants. For these reasons, the Court will dismiss Counts 15 and 16, but because Plaintiffs may be able to cure the pleading defects, the Court will grant Plaintiffs leave to amend. *See Lopez*, 203 F.3d at 1127–30.

**IT IS THEREFORE ORDERED** granting in part and denying in part the Motion to Dismiss (Doc. 25) filed by Defendants Jack Rose; Quynh Palomino; Prescott Valley

Holdings (GA) GP, LLC; Prescott Valley Holdings (GA), LLC; Prescott Valley Holdings II (GA) GP, LLC; Prescott Valley Holdings II (GA), LLC; Iron Rings, LLC; and Trilogy Residences, LLC. The Motion is denied as to Count 1 for breach of contract against Prescott Valley Holdings (GA) GP, LLC; and as to Count 2 for breach of contract against Prescott Valley Holdings II (GA) GP, LLC. The Motion is granted as to the remaining claims against these Defendants, but Plaintiffs may amend the Complaint (Doc. 1) if they can cure the defects in those claims. However, Plaintiffs' prayer for punitive damages in Counts 1 and 2 is dismissed with prejudice, and Counts 7 and 8 for Intentional Misrepresentation are dismissed as redundant to Counts 5 and 6.

**IT IS FURTHER ORDERED** granting in part and denying in part the Motion to Dismiss (Doc. 28) filed by Defendants Jason Joseph and Trilogy Investment Company, LLC. The Motion is denied as to Counts 5 and 6 for fraud against Trilogy Investment Company; as to Counts 9 and 10 for violation of § 12(a)(2) of the Securities Act of 1933 against Trilogy Investment Company; and as to Counts 11 and 12 for violation of § 15 of the Securities Act of 1933 against Jason Joseph. The Motion is granted as to the remaining claims against these Defendants, but Plaintiffs may amend the Complaint (Doc. 1) if they can cure the defects in those claims.

**IT IS FURTHER ORDERED** that Plaintiffs may file an Amended Complaint by **June 29, 2026**, if they can cure the defects in the dismissed claims. If Plaintiffs do not timely file an Amended Complaint, the case will proceed on the Complaint, and the remaining Defendants shall file an Answer to the remaining claims by **July 13, 2026**.

Dated this 8th day of June, 2026.

Honorable John J. Tuchi
United States District Judge